# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No 22-0518V

|   |   |
|---|---|
| JOAN KRESL,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br><br>Filed: April 1, 2024 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Ryan Daniel Pyles, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION ON DAMAGES[1]

On May 11, 2022, Joan Kresl filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that after receiving an influenza ("flu") vaccine on October 28, 2020, she suffered from Guillain Barré syndrome ("GBS"), corresponding to a listing on the Vaccine Injury Table (the "Table"). Petition at 1; *see also* 42 C.F.R. §§ 100.3(a), (c)(15). The case was assigned to the Office of Special Masters ("OSM")'s Special Processing Unit ("SPU"), and in March 2023, Respondent conceded Petitioner's

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

entitlement for the Table flu/ GBS claim. ECF Nos. 19, 20. However, by June 2023, the parties determined that they could not agree on the appropriate pain and suffering award. After Petitioner filed additional evidence and the parties briefed their respective positions,[3] the matter was submitted for an SPU "Motions Day" expedited hearing on March 28, 2024.[4,5]

**Consistent with my Motions Day oral ruling, which is fully incorporated herein and summarized below, Petitioner is entitled to $180,000.00 (for actual pain and suffering).**

I. **Authority**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of*

---

[3] Petitioner's Damages Brief filed on Aug. 7, 2023 (ECF No. 28); Respondent's Response filed on Oct. 4, 2023 (ECF No. 32); Petitioner's Reply filed on Oct. 20, 2023 (ECF No. 32).

[4] *See* Minute Entry entered March 28, 2024 (Non-PDF). The transcript of this hearing, which was not yet filed as of the date of this Decision, is hereby incorporated into this Damages Decision by reference.

[5] Michael Milmoe appeared on behalf of Petitioner, and Shelly Jock appeared on behalf of Respondent.

*Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[6] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.   Relevant Evidence

Upon receiving the at-issue vaccine on October 28, 2020, Ms. Kresl was 79 years old with a "non-contributory" medical history. Response at 1. She recalls working as a substitute teacher a few days a week, and otherwise remaining active through various recreational activities. Ex. 12 at ¶ 1.

---

[6] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Eleven days post-vaccination, on November 8, 2020, Petitioner arrived at an emergency room ("ER") with complaints including weakness in both arms and legs which caused difficulty walking, as well as styling her hair. Ex. 6 at 9, 13. She was admitted for observation, and the initial neurological evaluation raised a suspicion for GBS. *Id.* at 20. Petitioner did not undergo a lumbar puncture or EMG, on the neurologist's reasoning that those were typically "normal [so] early on," but she did undergo a head CT, and MRIs of the brain and cervical spine. *Id.* at 20, 39. Starting on November 9th, she received five days of IVIg. *Id.* at 20. On November 11th, she was noted to have dysphagia requiring a special diet. *Id.* at 41 – 42. On November 13th, she was transferred to the intensive care unit ("ICU") due to worsening weakness and mental status changes (described as "encephalopathic"), after which her condition improved with intravenous hydration. *Id.* at 28. She also developed urinary retention requiring a catheter, and labile blood pressure. *Id.* at 28. The inpatient hospital stay ended on November 18th (totaling 10 days).

On November 18, 2020, Petitioner was transferred to an inpatient rehabilitation center, where she initially painted a "quadriplegic-like picture" involving weakness and areflexia. Ex. 3 at 918. She started daily speech, occupational, and physical therapies. *Id.* The urinary and blood pressure issues improved during this period. *Id.* On November 27th, Petitioner was started on gabapentin for a "pins and needles" sensation. Ex. 3 at 993, 998. On December 21st, the gabapentin prescription was increased due to Petitioner's complaint of a "band-like tightness" in her torso. *Id.* at 1104, 1106. After 35 days in inpatient rehab, on December 23, 2020, Petitioner was discharged home with a wheeled walker, plus a wheelchair for use outside of the home. *Id.* at 117.

On January 12, 2021, Petitioner underwent an EMG with findings consistent with a "moderately severe bilateral sensorimotor polyneuropathy with both demyelinative and axonal features." Ex. 5 at 75. That same day, a neurologist told her to continue her therapies and follow up in three months. Ex. 5 at 65 – 72. After 13 out-patient OT sessions, Petitioner reported that she could step into a bathtub at home with a family member present. She was "doing fine with all daily tasks at home," had "met all goals," and voluntarily self-discharged with a home exercise program to help continue improving her strength and mobility. Ex. 3 at 663.

After 35 out-patient PT sessions, on March 28, 2021, Petitioner had achieved the "majority" of her goals. She continued to demonstrate "mild instability with mobility and decreased LE strength most notable distally." She was walking with a cane and wearing a brace because of a right foot drop. After the formal PT discharge, it was planned that she would continue a home exercise program. Ex. 3 at 11 – 14.

4

At an April 12, 2021, neurology follow-up, Petitioner was noted to have full muscle strength and normal sensation. Ex. 5 at 61. Her gait was "much better than last seen," but she was using a cane and an orthotic brace for an ongoing right foot drop. *Id.* At this point, the neurologist credited that Petitioner had ongoing "tightness from GBS also." *Id.* Petitioner was instructed to slowly wean off gabapentin if possible, continue avoiding the flu vaccine (although COVID vaccines were "OK"), and follow up in 4 – 6 months. *Id.*

At her next neurology follow-up on September 28, 2021, Petitioner's lower extremity weakness was "much better" and her right foot drop was "nearly resolved," but she still had "some" numbness in her feet and some tightness in her torso area still attributed to GBS. Ex. 7 at 1. She was not using any assistive devices, denied any falls, and was no longer taking gabapentin. *Id.* She would schedule further neurology follow-ups "if needed." *Id.*; *see also* Ex. 9 at 5 – 12 (October 6, 2021, primary care record).

The next medical record is from approximately seventeen (17) months later, on March 6, 2023, when Petitioner complained of "tingling in toes and balance is not great," but she again denied any falls. Ex. 11 at 2. The neurologist's exam did not document any objective findings, and he assessed: ""Recovered very nicely… She longer has any weakness in limbs or feet." *Id.* at 3. Petitioner also complained of weight gain and a "band-like sensation" around her torso – but the neurologist assessed: ""The weight gain and the tightness in the abdomen is not related to GBS… Offered to do MRI T spine in light of her tightness sensation, but she declined… Follow up with PCP to check on weight issues." *Id.* at 4.

I have also considered Petitioner's two affidavits (Exs. 10, 12), especially to the extent that they supplement the medical records in detailing GBS's impacts on her life.

## III. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that Ms. Kresl was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of her injury.

When performing this analysis, I review the record as a whole, including the medical records and affidavits filed, all assertions made by the parties in written documents, and the arguments presented during the Motions Day hearing.

The medical record evidence (as summarized above and reviewed by the parties) reflects that Ms. Kresl's initial course was moderately severe (notwithstanding the relatively prompt diagnosis and start of appropriate treatment, IVIg), including in-patient hospitalization and rehabilitation totaling 45 days, a "quadriplegic-like picture," the start of

prescription pain medications, and a "moderately severe" neuropathy when first visualized 2 months into the course). She achieved a relatively good recovery, especially with a further 13 OT sessions and 35 PT sessions, concluding less than five months into the course. She stopped taking gabapentin and her right foot drop was "nearly resolved" by eleven months post-vaccination – marking the overall conclusion of her treatment course. The subsequent 17-month gap in medical record documentation, followed by the neurologist's somewhat "black and white" language, further supports that Petitioner overall achieved a good recovery from her GBS, even if there are some ongoing lingering impacts like fatigue. Additionally, it would not be fair to lower the GBS pain and suffering award based on Petitioner's relatively older age – especially in light of the *lack* of any particular comorbidities, and the unrebutted evidence indicating that she maintained a very active lifestyle including part-time employment, until her energies shifted to recovering from GBS.

Respondent's proffer of $135,000.00 is a good starting point, especially in recognizing the *initial* seriousness of GBS generally and in this specific case. But Respondent places insufficient weight on this case's ongoing residuals – for instance, by suggesting that Ms. Kresl's substitute teaching is "not inconsistent… with being effectively retired." Response at n. 3. And I find that Ms. Kresl had longer inpatient hospital and rehabilitation stays, more outpatient formal therapy, and a slower recovery than the petitioner in Respondent's only cited comparable case. Response at 7, citing *Weil v. Sec'y of Health & Hum. Servs.*, No. 21-0831V, 2023 WL 1778281 (Fed. Cl. Spec. Mstr. Feb. 6, 2023) (awarding $140,000.00 for actual pain and suffering). Thus, a higher award is appropriate.

Petitioner requests $250,000.00 for her actual and/or future pain and suffering from GBS – but she has not cited any past reasoned opinions to support that valuation. She instead defends the sum by referencing flu-GBS settlements obtained by her counsel's firm; economic inflation since Congress imposed the statutory cap on pain and suffering in the Program; and what jury verdicts outside of the Program might allow. Brief at 12 – 14. But I do not find these arguments useful in performing my calculation herein. I *may* approach or surpass an award of $200,000.00 for GBS pain and suffering in future cases with compelling facts particularly of severe GBS residual effects, which are documented in evidence beyond just the petitioner's own affidavit – but otherwise, GBS as an injury does not mean that an award at the very top of the pain and suffering "cap" is *per se* appropriate.

Ms. Kresl's injury course and history bears similarity to other petitioners whose GBS was initially severe, but who substantially recovered within about one-year post-vaccination, with some ongoing lingering impacts like fatigue. *See, e.g., Nyhuis v. Sec'y*

*of Health & Hum. Servs.,* No. 21-1615V, 2023 WL 2474326 (Fed. Cl. Spec. Mstr. Feb. 10, 2023) (awarding $170,000.00 for actual pain and suffering); *Wilson v. Sec'y of Health & Hum. Servs.*, No. 20-0588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021) ($175,000.00). I find that Petitioner has established actual pain and suffering justifying an award of $180,000.00.

## Conclusion

**Consistent with the above, I award Petitioner a lump sum payment of $180,000.00 (representing actual pain and suffering).** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[7]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.